UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| James Calwise and Dante Stanton, | : | Case No. 1:14-cv-722 |
| Plaintiff, | : | |
| vs. | : | |
| US Bank, | : | |
| Defendant. | : | |

## ORDER

Before the Court is Defendant's motion for summary judgment. (Doc. 24) Plaintiffs oppose the motion (Doc. 28), and Defendant has filed its reply. (Doc. 32) For the following reasons, the Court will deny Defendant's motion.

## FACTUAL BACKGROUND

James Calwise and Dante Stanton both worked for US Bank. They were both terminated for the same reason, and they filed separate lawsuits alleging they had been fired in retaliation for complaining about sexual harassment of a bank employee by a manager in their department. Their separate lawsuits were consolidated for all purposes. (Doc. 13)

Calwise started working for US Bank in February 2010, when he was hired as a quality analyst. In January 2013, Calwise was promoted to a collections supervisor in the mortgage default counseling division. In that position, he worked at the bank's Lunken facility and supervised ten other employees. One of his job duties was to recruit and interview candidates for open positions at the Lunken center.

On September 17, 2013, one of Calwise's supervisees told him that she was

being harassed by Jamar Cody, another manager.  The next day Calwise reported the subordinate's complaint to Brandon Singleton, the Lunken center's site manager, and to Steve Brinkman, the collections manager and Calwise's direct supervisor.  They in turn notified Linda Mitchell, in the bank's human resources department, of the complaint.  US Bank maintains a written policy prohibiting sexual harassment and any retaliation against anyone who lodges a good faith complaint about such harassment.  Later that day, Calwise and Mitchell exchange an instant message, in which Mitchell said "Thank you for your help."  Calwise responded, "You're welcome. ... Even though [the employee, Monica Cole] asked me not to say anything, but just to say if this did take place and something escalated further and she states 'I told James but I wished it would go away,' then I'll be in trouble for not saying anything that could have prevented such a situation." [sic]  Mitchell told Calwise, "You did it the right way.  This is part of management's job to see issues and follow up.  Good job."  (Calwise Dep. Ex. 16, PAGEID 335)

      The next day, September 19, 2013, Calwise was scheduled to interview a potential new employee.  He asked a co-worker, Devin James, to conduct the interview with him.  Calwise often conducted interviews with Stanton, but he began a paternity leave that day and was not at work.  James agreed to do the interview.  A short while later, Calwise took James to the work floor where James saw the interviewee sitting with another employee and listening to telephone calls with bank customers placed by that employee.  Calwise and James then took the candidate to another room and completed the interview.  Calwise told James that he usually allows candidates to visit the work area and listen to a few phone calls, to be sure that it is the type of job they

would be interested in doing. Devin James informed Steve Brinkman that Calwise permitted a job candidate to listen to the employee's phone call. Devin James wrote a statement later that day, in which he stated that Calwise's conduct "seemed a large security violation." (Calwise Dep. Ex. 12, PAGEID 330)

Calwise was terminated later the same day by Steve Brinkman and Terry Hairston, from US Bank's HR department. Brinkman and Hairston told Calwise that he had violated the bank's privacy policy when he allowed a job applicant to sit with an employee and listen (with headphones) to a collection call as part of Calwise's interview of the applicant. A US Bank information security policy in effect at the time states in pertinent part: "[I]nformation classified as internal or confidential must not be made available to the general public. ... Personnel must take all appropriate measures to ensure that conversations about non-public bank information are not overheard by unauthorized individuals." (Calwise Dep. at 33 and Ex. 8, PAGEID 221 and 267)

Dante Stanton began working for US Bank in June 2004 as a collector. He was promoted to a collector lead in December 2010, and he moved to the Lunken facility in December 2012 as a collections supervisor over the "Dollar team." He initially reported to Tenia Bishop, and then to Steve Brinkman beginning in March 2013. Stanton and Calwise had the same job title and oversaw the same team of collectors. On September 18, Calwise told Stanton about the complaint he received from Monica Cole about sexual harassment. Stanton joined Calwise in going to see Brandon Singleton to report the incident.

Stanton began a paternity leave on September 19, 2013 and was not at work that day when Calwise was fired. Calwise called Stanton that night and told him what had

happened, and that he had heard that Stanton was going to be fired when he returned from his leave. (Stanton Dep. at 54, PAGEID 382) Stanton returned to work on October 3, 2013, and asked Steve Brinkman if he was going to be terminated; Brinkman responded "I don't know." (Id. at 65, PAGEID 384) Stanton was terminated on October 8, 2013 by Brandon Singleton and Terry Hairston. According to a summary written by Singleton (Stanton Dep Ex. 20, PAGEID 534), which Stanton concedes is largely accurate, Singleton told Stanton that he was being terminated because he permitted job applicants to listen in on customer telephone calls, and he had given "trends" (apparently lists of customer telephone numbers) to his employees that included customers with active bankruptcy cases. This apparently resulted in telephone calls that violated the automatic stay entered by the bankruptcy court in such cases.

Devin James was a supervisor of loan collections at the Lunken facility, and a co-worker of Stanton and Calwise. The other supervisors were Jamar Cody (the alleged harasser) and Ben Gruen. All of the supervisors reported to Steve Brinkman at the time. Devin James had participated in candidate interviews with Stanton and Calwise on previous occasions, but he testified that those interviews were always conducted in the conference room or in Brandon's office, which was located on the collections floor. James had never seen either of them permit an interviewee to listen to customer phone calls prior to or during an interview session. (Doc. 19, D. James Dep. at 13-14, PAGEID 94-95)

The parties agree that the Lunken call center has a high employee turnover rate. In the months before September 2013, Singleton told Calwise and Stanton that they needed to keep interviewing candidates for open positions, to keep candidates "in the

-4-

pipeline" to try to reduce the time that positions were left open.  (Doc. 21, Singleton Dep. at 24-25, PAGEID 163)  Singleton testified that Calwise came to his office on September 18 to make a report of sexual harassment, and Singleton asked Brinkman to join them.  He then told HR and his manager about Calwise's report, and asked Calwise to prepare a written statement that would be given to HR about the situation.  The following day, Singleton was at lunch when Brinkman called him, and told him what Devin James had said about the job applicant listening to an employee telephone call.  Singleton called the bank's HR department and his own manager, and was told to "get a statement" (from Devin James).  (Id. at 37-38, PAGEID 166-167)  Brinkman also sent an email at 1:17 p.m. on September 19 to Dante Stanton, James Calwise, Devin James, Ben Gruen and Jamar Cody, stating: "Effective immediately, I don't want anyone on the department floor unless they are an employee of US Bank, or unless previously approved by Brandon or myself.  This means all interviews need to be conducted in the conference room out in the front lobby.  This department has sensitive customer and internal US Bank information all over it. ..."  (Doc. 22, Calwise Dep Ex 18, PAGEID 346)

  Singleton forwarded Devin James's written statement about the incident to Linda Mitchell (who works in Owensboro, Kentucky) and to his supervisor, Ms. Edwards, around 4 p.m. on September 19.  Edwards responded in an email a short time later that stated "Approved for termination."  Singleton either forwarded that email to Brinkman or told him about it, as Singleton was not present Brinkman terminated Calwise. Singleton conceded that he did not talk to the floor employee who was involved in the candidate interview earlier that day, nor review any of the telephone calls that employee was involved in at the time.  He did not speak to other supervisors about Calwise's claim that

he had conducted other interviews in the same fashion before, and that other supervisors on the floor knew it and did not express any concerns.

Singleton sent another email on October 2 to Linda Mitchell, saying that Stanton was scheduled to return to work the next day and he wanted to know if Mitchell " ... spoke to legal and if I should proceed with the termination tomorrow as planned." (Doc. 21, Singleton Dep. Ex. 4, PAGEID 197) The next communication in the record from Singleton to Mitchell was an October 7 email, when Singleton asked Mitchell to approve Stanton's termination. The email cited the candidate interview and the lists of telephone numbers of customers in active bankruptcy proceedings, which Singleton told Mitchell had just been discovered. Mitchell responded "APPROVED." (Singleton Dep. Ex. 5, PAGEID 198) Mitchell did not talk to anyone at Lunken about Stanton's situation before sending her response. Singleton and Terry Hairston met with Stanton on October 8 and terminated him.

Calwise and Stanton each filed claims with the EEOC, alleging they were terminated in retaliation for their complaint about sexual harassment of an employee by another supervisor. Their subsequent complaints allege claims of unlawful retaliation under Title VII, 42 U.S.C. §2000, and Ohio Rev. Code 4112.

## DISCUSSION

Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of an undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits,

admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.  Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002).  Once that occurs, the party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

The burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  "If the evidence is merely colorable, ...  or is not significantly probative, ... the court may grant judgment."

Anderson, 477 U.S. at 249-50 (citations omitted).

The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

Retaliation Claims

Plaintiffs' retaliation claims, based on circumstantial evidence and brought under federal and state law, will be considered together because the same analysis applies to all of them. Imwalle v. Reliance Med. Prods., 515 F.3d 531, 544 (6th Cir. 2008). In order to establish a prima facie claim, each Plaintiff must show: (1) he engaged in protected activity; (2) US Bank knew about that activity; (3) US Bank took an adverse employment action against him after that activity; and (4) the adverse action was causally connected to the protected activity. Upshaw v. Ford Motor Co., 576 F.3d 576, 588 (6th Cir. 2008). "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action." Id.

US Bank contends that neither Plaintiff can show a causal connection between their protected activity (reporting the sexual harassment) and their termination, because the only evidence they have is the temporal proximity of the two events. And temporal proximity alone is generally insufficient, especially where the events are separated by some period of time. While US Bank concedes that the proximity of the events in this case is quite short, it argues that it only coincidentally learned of the "side-by-side" interviews the very next day, providing a legitimate basis for Plaintiffs' termination.

The Sixth Circuit has recognized that in some cases, temporal proximity may be sufficient to establish the causal link for a prima facie retaliation claim. See Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523-26 (6th Cir. 2008):

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

Given the extremely close proximity of the two events (less than 24 hours separated the harassment report and Calwise's termination), and recognizing that the prima facie burden is not an onerous one, the Court finds that each of the Plaintiffs has established a prima facie claim.

US Bank asserts that both of the Plaintiffs were terminated for legitimate, non-retaliatory reasons: violating company policy regarding the confidentiality of customer information. Both of the Plaintiffs admitted that they had allowed interviewees to participate in what the parties call "side-by-side" telephone calls with employees on the floor, which US Bank argues is a clear violation of the confidentiality policy. US Bank's burden at this stage is one of production only, not one of persuasion. Therefore, each Plaintiff must come forward with evidence showing that this explanation is a pretext. He may do so by showing (1) the stated reason has no basis in fact, (2) the reason given is not the actual reason for his termination, or (3) the reason is insufficient to explain Defendants' action in terminating him. See Imwalle v. Reliance Med. Products, Inc.,

-9-

515 F.3d 531, 545 (6th Cir. 2008), citing Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994). The Sixth Circuit has made it clear, however, that it has "... never regarded those categories as anything more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?' " Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012).

US Bank's reason has some factual basis, in that both Plaintiffs admitted that they had allowed interviewees to listen to customer telephone calls. But as Plaintiffs note, the issue is not whether they violated a policy, but whether US Bank used that reason as a pretext to disguise retaliation. Calwise and Stanton claim that Brinkman and Singleton were friends with Cody, the supervisor accused of harassment. They both testified that the practice of letting job candidates listen to telephone calls was discussed in a supervisors' meeting with Brinkman several months before they were terminated. Calwise explained that due to the high turnover in the collections department, Singleton and Brinkman repeatedly emphasized the importance of continuous interviews of job candidates to fill open positions as they arose. Calwise proposed having candidates "listen in" on telephone calls, to avoid hiring an employee who then quickly leaves the job when he or she discovers that they do not like telephone collections work. Calwise described one specific incident involving an interviewee who participated in a "side-by-side" call with an employee. The candidate almost immediately told Calwise that she was not interested in the job, saving Calwise the time and effort of completing the interview process. Calwise described this incident during the meeting with Brinkman. Calwise and Stanton believe that Brinkman was fully

aware of the practice and approved it several months before they were terminated.

US Bank notes that the initial report about Calwise allowing an interviewee to listen to the telephone calls was made by Devin James, who had no knowledge about the sexual harassment complaint reported by Calwise and Stanton the previous day. Devin James' report prompted the investigation, belying any suggestion that Singleton or Brinkman trumped up the importance of the incident to justify terminating Calwise because of his protected activity. US Bank also cites Mitchell's email to Calwise on September 18, assuring him that he had done the right thing in reporting the harassment complaint. US Bank argues that these facts establish that it made a reasonably informed decision to terminate Plaintiffs that had nothing to do with their protected activity.

Plaintiffs respond by citing discrepancies in the evidence about the timeline of events of September 19, 2013. Devin James testified he told Brinkman about Calwise's plan for the interview immediately after Calwise asked him to participate, which James said was before 1 p.m., the scheduled interview time. Brinkman testified that he knew nothing about it until the interview was finished and the candidate had left the premises. Since the interview started around or shortly after 1 p.m., US Bank has not explained how Brinkman knew about the situation by 1:17 pm, when he sent out his email to all supervisors that "effective immediately," no unauthorized people should be allowed on the work floor. Plaintiffs also cite a report Singleton completed in December 2013 for the bank's privacy group, in which he stated that Devin James told Brinkman about the incident only after the interview was complete and the candidate had left the building. James expressed "surprise" about Calwise's conduct. (Singleton Dep. Ex. 9, PAGEID

209) Plaintiffs argue that these conflicts would permit a jury to conclude that Brinkman intentionally refrained from telling Calwise that allowing a candidate to listen to telephone calls would violate bank policy.  Plaintiffs also note Singleton's admission that after Calwise and Stanton claimed that Brinkman and other floor supervisors all knew about the interview practice and never raised a concern, Singleton did not investigate their claims or try to discover if other US Bank employees were involved in the conduct and, if so, should also have been disciplined.

    The second pretext factor - that the stated reason is not the actual reason - requires evidence suggesting that Plaintiffs' protected activity more likely prompted their termination.  US Bank cites its written policy forbidding any retaliation against employees who make good faith reports of sexual harassment.  And they note that Linda Mitchell assured Calwise that he had done the right thing in reporting the situation to Brinkman and Singleton (even though the employee in question asked Calwise not to do so).  Plaintiffs respond that the conflicting evidence regarding when Brinkman knew about the planned interview raises an inference of a retaliatory motive, that he "set up" the situation in order to justify terminating Calwise (and then Stanton).  And Linda Mitchell relied exclusively upon information given to her by Singleton. She did not investigate Plaintiffs' assertion that the practice had been approved and in effect for several months.  Singleton admitted that neither Calwise nor Stanton was facing any discipline, much less a possible termination, before the September 19 interview.  Given their work history, Plaintiffs contend that US Bank has not explained why progressive discipline, or a written warning of some sort, was not considered before they were abruptly terminated.

As to the third avenue of showing pretext, US Bank argues that Plaintiffs' conduct was clearly sufficient to motivate their discharge. They violated a bank policy of which they both admitted knowledge. US Bank cites one other employee who was discharged under what the bank contends was similar circumstances. US Bank discovered that an employee named Tolliver sent confidential customer information to his own home email address, and he was terminated as a result. Mitchell told the EEOC that an employee sending customer confidential information to his home "is a very rare happening within our group." (Doc. 28-1 at PAGEID 600) Plaintiffs argue this individual is not similarly situated because his infraction is not comparable. There is no evidence that any customer information was actually compromised during any of the candidate interviews in which Calwise and Stanton participated. More importantly, there is no suggestion that Tolliver believed it was permissible to engage in such conduct, or that anyone at the bank had led him to believe that it was. Plaintiffs contend that Brinkman was on the work floor frequently, and must have seen candidates participating in telephone calls on many occasions. Yet Brinkman never lodged a complaint or a concern about the practice until Plaintiffs engaged in protected activity. Regina McKinley, an employee who worked in Plaintiffs' group, testified that she had a conversation with another supervisor (Ben Gruen) about one candidate's interview, but Gruen never suggested to her that it violated any bank policy. McKinney also told Linda Mitchell that she and others were aware of job candidates listening to customer calls as part of the interview process, yet US Bank did no investigation to determine who else may have violated the confidentiality policy. At best, Plaintiffs argue that even if Brinkman did not expressly approve their conduct of interviews in this fashion, Plaintiffs reasonably believed that

they were not violating any bank policy by doing so.

In ruling on a motion for summary judgment, the Court may not resolve conflicts in witnesses' testimony nor determine their credibility. While the quantity of circumstantial evidence in this case is not large, it is enough to raise a genuine dispute whether or not US Bank's explanation of its decision to terminate Plaintiffs is its actual reason, or is a pretext for retaliation.

## CONCLUSION

For all of the foregoing reasons, the Court denies Defendant's motion for summary judgment. (Doc. 24)

**SO ORDERED.**

DATED: January 19, 2016              s/Sandra S. Beckwith
                                     Sandra S. Beckwith, Senior Judge
                                     United States District Court